IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

IRENE D. SALAZAR,

        Plaintiff,

v.                                         CIV 00-1503 LH/KBM

LARRY G. MASSANARI,[1]
Commissioner of Social Security,

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

    Plaintiff Irene Salazar filed an application for benefits alleging an onset date of February 1995 based on the impairment of tinnitus, which in turn caused loss of concentration, headaches, nervousness and depression.  Following consultative evaluations by two psychiatrists and the final hearing where a vocational expert was present and testified, the Administrative Law Judge ("ALJ") denied benefits on December 22, 1997.  The Appeals Council denied review on September 15, 2000.

    This action was filed on October 25, 2000, and the matter is now before the Court on Plaintiff's Motion to Reverse and Remand for a Rehearing.  *Doc 9*.  Having reviewed the entire record and considered the arguments and relevant law, I recommend that Plaintiff's motion be granted and the matter remanded to the Commissioner for further proceedings.

---

    [1] On March 29, 2001, Larry G. Massanari became the Acting Commissioner of Social Security.  In accordance with FED. R. CIV. P. 25(d)(1), Mr. Massanari is substituted for Kenneth S. Apfel as the Defendant in this action.

## I.  Medical Factual Background

From 1979 to 1986 Plaintiff operated a mailing machine and stacked/transported newspapers for the Albuquerque Publishing Company.  *Record* at 95-96.  After leaving her job she moved to California and returned within a year.  She moved in with her father, a retired veteran, who supports her while she takes care of him and the house.  *See Record* at 163, 179, 227.

In 1989, Plaintiff began to suffer conductive hearing loss due to otosclerosis in her right ear and a stapedectomy corrected the problem.[2]  *Id.* at 197.  In May 1995, Plaintiff appears to have had a comprehensive physical examination.  Among other things, she reported ringing in her ears.  *Id.* at 163.  Ringing in the ears is an ailment known as tinnitus, which cannot be measured objectively.  *See id.* at 183-84.  Plaintiff reported that initially the ringing only occurred at night but it had progressed to a continual ringing.  A hearing test showed Plaintiff was losing hearing in her left ear.  *Id.* at 163.

Dr. Dichard became Plaintiff's treating physician for the subsequent ear surgeries, *id.* at 183.  Myra Kemna, a physician's assistant, and occasionally someone named "Hardy" appear in Plaintiff's medical records as the "primary care physician."  Ms. Kemna's signature appears on many of the records.  The treating physician signatures on these "Kemna records" are illegible, but they do not resemble Dr. Dichard's signature.  Apparently, some other internist treated Plaintiff

---

[2] Otosclerosis is defined as a "new formation of spongy bone about the stapes and fenestra vestibuli . . . resulting in progressively increasing deafness, without signs of disease in the eustachian tube or tympanic membrane."  A stapedectomy is defined as an operation "to remove the stapes footplate in whole or part with replacement of the stapes superstructure . . . by metal or plastic prosthesis; use for otosclerosis with stapes fixation."  *Stedman's Medical Dictionary,* 25th Edition.

for her other ailments, including perimenopausal symptoms, and depression. Dr. Dichard attended the August 1995 stapeodectomy performed on Plaintiff's left ear. *Id.* at 196.

After the surgery and throughout the remainder of the year, Plaintiff was treated for perimenopausal symptoms with hormone replacement therapy. She also consulted with a social worker about getting help for her father's drinking. Physician notes during this period attribute Plaintiff's "emotional lability"[3] to perimenopause and the father's drinking, but show that by the end of the year her father was not drinking during the day and Plaintiff was "feeling good" taking the hormones. However, Plaintiff's complaints of tinnitus had not been resolved.[4]

On February 8, 1996, Plaintiff saw Dr. Dichard with complaints of continued tinnitus and hearing loss. He scheduled a revision stapedectomy, but advised Plaintiff that the tinnitus "probably won't improve" and gave her unspecified "strategies for coping." *Id.* at 201. On February 19, 1996 the "repair" operation was performed with Dr. Dichard attending. *Id.* at 195.

Based on all objective tests, Plaintiff's hearing is fine. However, after the second surgery she continued to complain of tinnitus. A May 1996 visit indicates Plaintiff was taking her hormone replacement therapy incorrectly which affected her "emotional lability." She also had

---

[3] The online Oxford English Dictionary defines "lability" as "liable or prone to lapse" "prone to undergo displacement in position or change in nature, form;" "emotionally or behaviorally unstable."

[4] *See Record* at 149 (9/18/95; consultation with social worker re: how to deal with her father's drinking; "stressed"); *id.* at 152 (9/18/95 – complaints of tinnitus; "ENT aware appointment scheduled;" "emotional liability secondary to perimenopausal symptoms and patient is primary care giver to retired father who is alcoholic"); *id.* at 150 (10/5/95 – "patient reports tinnitus unresolved"); *id.* at 148 (10/18/95 – "home situation improving Dad stopped daytime drinking"; increased "emotional liability" associated w/perimenopausal symptoms"); *id.* at 147 (12/6/95 – "feeling good on HRT," cycling going well; affect: brighter").

"increased anxiety and mild depression mostly secondary to tinnitus bugging her, feels hopeless since told nothing will help" and "sleeps all day and not at night."  Ms. Kemna described Plaintiff's affect as "bright, mild depressed speech, but appropriate thinking processes."  Ms. Kemna diagnosed "mild depression" and prescribed start Zoloft.  *Id.* at 137.

By July 1996, Ms. Kemna reports Plaintiff had discontinued taking Zoloft because it made "her sleep 10-11 hours a day."  She related, however, that the depression had improved since resuming regular hormone replacement therapy.  *Id.* at 136.  By the end of August 1996, however, Plaintiff reported pain and continual tinnitus, was again diagnosed with mild depression, but she reported that resuming the Zoloft made her feel better.  By October 1996, she was still complaining of chronic tinnitus and headaches.  Plaintiff was given Midrin for the headaches and literature for the tinnitus.  Plaintiff was referred to audiology to see if she was a candidate for a hearing aid to help with the tinnitus.[5]  It is unclear what happened with the recommendation that a "white noise" hearing aid be investigated as a solution to the tinnitus problem.

## II.  Psychiatric Factual Background

A total of three consulting psychiatrists examined Plaintiff, however the first report was not considered.[6]  Dr. Pamela Hughson was the only one who completed a functional assessment

---

[5] *See Record* at 135  (7/29/96 – pain [unclear where], mentions TMJ); *id.* at 141 (8/18/96 – "continual tinnitus"; "discussed tinnitus [illegible] strategies, etc. . . . follow up Dr. Dichard"); *id.* at 134 (8/27/96 – "mild depression;" patient "restarted Zoloft and feels better"); *id.* at 190 (10/17/96 – complaints of tinnitus and tension head aches); *id.* at 191 (10/29/96 – headaches, chronic tinnitus; to consult with audiology to see if patient is candidate for hearing aid; patient given brochure on American Tinnitus Association; prescribed use of massage and trial of Midrin for headache); *id.* at 182 (12/3/96 – chronic tinnitus secondary to severe otosclerosis, tension headaches; Midrin helped).

[6] Dr. Carlos Balcazar's evaluation could not be used because he used the DSM-III instead of the DSM-IV and did not prepare a functional assessment form.  He was of the opinion that

4

form. Plaintiff reported to Dr. Hughson that after the repair surgery "she has almost constant 'hissing and ringing' in her ear and that she has become quite discouraged with the opinion of the ear specialists who have told her there is nothing else they can do for her." *Id.* at 228. Plaintiff reported that the "most help" she received was "from her primary care physician . . . who placed her on Zoloft about one year ago." However, she also reported that "all her activities" are affected by the tinnitus:

> She says she is quite anxious and actually fears that she will wake up one day and find herself insane. She says activities such as any type of physical exercise, being in crowds, being in heavy traffic or watching TV can all cause an increase in the noise in her ear so that she finds herself "freaking out." In conversations with groups of people, she finds herself anticipating that she is not going to be able to hear everything that is said. . . . At times she is so discouraged by these worries that she admits to being irritable towards friends and relatives and "doesn't want to see anybody" including her grandchildren. . . . At times she finds herself crying and feeling desperate "to get this out of me," meaning the noise. . . Although at times she is able to get a good 8 hours a night sleep anywhere from twice a week to every other day, she might find it very difficult to fall asleep if the noise becomes distracting for some reason when she is about to fall asleep. She says she has started using Nyquil on a fairly regular basis for this reason. She also admits to some marked increase in her consumption of alcohol over the past two years and admits to drinking about 10 beers in the evening about every other day currently. She rationalizes this by telling herself "what other cure is there for me," "what have I got."

---

Plaintiff's "optimal functioning during the course of the last year has been poor," and that although she could work "simple jobs" he "fore[saw] difficulty in her interaction with coworkers or supervisory personnel." He noted Plaintiff reported the "permanent" ringing in her ears was "torture," she experiences the syndrome "catastrophically," and she began using alcohol in April 1996 to be able to sleep at night. *See Record* at 178-180. At the first hearing convened in this matter, an ALJ, who had handled other tinnitus cases and stated "ringing in the ear syndrome is certainly an issue that's worthy of being explored," decided to gather more evidence through a psychiatric evaluation with a functional assessment, the treating physician's most recent records, and a possible audiology consultation. *Id.* at 264. Another ALJ conducted the hearing and issued the decision when the matter was reconvened later.

> Besides the fears of becoming seriously mentally ill, she thinks of the noise in her ear as "a bomb in there and ticks and ticks and when is it going to go off."

*Id.* at 228.

Dr. Hughson assessed Plaintiff as "quite adversely effected [sic] by the problems . . . with . . . unmitigated tinnitus," a condition that "constantly preoccupies" Plaintiff and about which she "tends to magnify and . . . think catastrophically." The doctor states she imagined that "living with constant ringing and noise in the ears would be a substantial challenge for any so-called well-adjusted person." Dr Hughson believed that a DWI charge in 1990 indicated an alcohol dependency of longer than two years, but that Plaintiff's "abuse" of alcohol "probably . . . started in an attempt to 'medicate' her anxiety disorder [and] is certain to be aggravating her anxiety and also decreasing her capacity to cope with her hearing problem in a more adaptive way." *Id.* at 230-31. Dr. Hughson diagnosed Plaintiff as having "significant psychosocial stressors in a number of areas including . . . coping with a chronic and very emotionally debilitation physical condition" and a "global assessment of functioning" score of "55-60 with moderate to serious symptoms and moderate to serious difficulty in functioning." *Id.* at 232.

Ellen Soisson, a psychologist, also assessed Plaintiff and administered certain tests. Plaintiff reported to her that she was using nine beers every other night to fall asleep and on alternating nights used Nyquil, smokes half a pack of cigarettes a day and drinks four caffeinated beverages a day. *Id.* at 238. Plaintiff tested "extremely high" on the Burns Anxiety Inventory, and even though Ms. Soisson suspected "some exaggeration in her report of these symptoms," she found a generally high level of anxiety. *Id.* at 239. Plaintiff tested at 33 on the Burns Depression Checklist and at the borderline intellectual range on the WAIS-R. *Id.* at 239-40.

### III.  Analysis

The issue before the ALJ is whether the anxiety/stress/depression Plaintiff claims to suffer from alleged tinnitus results in her inability to perform any type of work.  The ALJ ultimately decided the case at step five, finding that with the limitations of borderline intellectual function and inability to work in noisy environment or stressful situations, Plaintiff could perform unskilled jobs such as parking lot attendant or advertising material distributor.

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992).  My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for the agency's.  *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted).

Plaintiff asserts three errors:  (1) the ALJ found Ms. Salazar's tinnitus does not affect her ability to work; (2) the ALJ did not assess the impact of Ms. Salazar's mental impairment on her ability to work; and (3) the vocational expert answered an incomplete hypothetical question.  Having carefully reviewed the entire record, I agree the matter should be remanded.

In general, the ALJ's decision is unclear and internally contradictory.  For example, at steps two through four, the ALJ found tinnitus as a potentially disabling "severe" impairment such that Plaintiff cannot return to her past relevant work.  On the other hand, portions of the opinion appearing to assess residual functional capacity entirely reject Plaintiffs' assertion that she suffers

7

from tinnitus or find the condition does not interfere with Plaintiff's ability to function. In reaching the residual functional capacity question either at step four or five, the ALJ's decision in several respects seems based on an analysis not supported by "substantial evidence." The following examples are illustrative, not exhaustive.

### *Plaintiff's Credibility*

Plaintiff testified at the hearing that caring for her father and his household (dressing a wound, helping him with his medication, cleaning, shopping, cooking, paying bills, etc.) requires about twenty hours a week. Her siblings assist her with caring for her father. To deal with the tinnitus headaches during the day, she takes Midrin and lies down. In about twenty minutes she is ready to go about her business. To deal with the tinnitus sounds during the day, she lies down for about an hour to an hour and a half. For tinnitus sounds keeping her awake at night, she tries to tire herself out during the day and self-medicates with eight to ten beers or with Nyquil. Plaintiff testified that she has found alternative methods of coping with the tinnitus ineffective (*e.g.,* taking baths and relaxing or using a radio with white noise by her bed). Evidently she has not tried other methods, such as quitting smoking and avoiding caffeine.

The ALJ found "many aspects of the claimant's testimony are not supported by the record" but only discussed her assertion that tinnitus causes her stress/anxiety/depression. The ALJ found Plaintiff not credible because her stress is associated with her father's drinking, not the continuing tinnitus:

> While the claimant complained of significant stress associated with her tinnitus, treatment records indicate that the claimant actually complained of significant stress associated with her father's constant drinking [citing 9/18/95 consultation with social worker, *id.* at 149] and that this improved when her father stopped drinking

8

> in the day time [citing 10/18/95 Kemna visit, *id.* at 148]. A later
> notation also indicated that the claimant's affect was brighter [citing
> 12/6/95 Kemna visit, *id.* at 147].

*Id.* at 15; *see also id.* at 17. As demonstrated by the information in brackets however, the evidence relied on for this finding occurred **prior** to the February 1996 repair operation. The ALJ ignores the medical evidence **after** that operation showing that tinnitus persisted and coping with it became Plaintiff's prominent complaint.

### *Discounting Dr. Hughson's Findings*

As noted above, Dr. Hughson attributes Plaintiff's anxiety/stress/depression to the tinnitus. A report by Ms. Kemna does the same. *Id.* at 185. The ALJ rejects their attributions of stress to tinnitus and Dr. Hughson's resulting "assessment of the claimant's functional limitations" because: (1) Dr. Dichard's report indicates that the surgeries "significantly improved" the tinnitus, *id.* at 16; (2) Ms. Kemna is not "an acceptable medical source," *id.* at 18; and (3) and the report of Dr. Dichard and other records form the University of New Mexico Hospital fail to document marked or severe problems associated with tinnitus or anxiety," *id.*

In concluding that the surgeries significantly improved the tinnitus, the ALJ quotes selectively from Dr. Dichard's report and misconstrues what the doctor's report intended to convey. Dr. Dichard explained in his report that he "must qualify this narrative with the fact that I have not treated her for anxiety nor have I treated with any behavioral modification for management of her tinnitus complaints." He recommended that "you pursue a neuropsychiatric examination with regard to her difficulties with attention, concentration, and sleeping." He further explained that tinnitus or "subjective appreciation of the body's inner sounds" is usually a symptom of those afflicted with otosclerosis, even after successful surgery. While Dr. Dichard

was "sure [Plaintiff's tinnitus problems] are significantly improved by the surgical outcomes," he also stated he did not "doubt that she has some residual tinnitus on both sides" after her surgeries. He also stated Plaintiff's "assessment and complaints of tinnitus are real. The bottom line is the need of assessment by the neuropsychiatrist to address the interference of this tinnitus with her ability to function." *Id.* at 183, 184.

Furthermore, even disregarding Ms. Kemna's opinion, the University medical records **do** note tinnitus as an ongoing problem resulting in stress and depression for which Plaintiff continues to take Zoloft. The first ALJ assigned the matter required the report from Dr. Hughson precisely because the critical inquiry is the effect of the condition on Plaintiff's mental state and her resulting functional capacity. *See infra* footnote 6. Yet, Dr. Hughson's report is the only medical report that analyzes Plaintiff's nonexertional impairments in terms of her ability to work. Wholesale rejection of Dr. Hughson's report was improper when based solely on a sentence from Dr. Dichard's report and only the few medical records Dr. Dichard had signed.[7]

### *Hypotheticals To The Vocational Expert Were Incomplete*

"Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991) (internal quotation and citation

---

[7] In rejecting the functional assessment of Dr. Hughson, the ALJ also appears to do so because her findings indicated Plaintiff "had a significant impairment associated with alcohol dependency . . . Public Law 104-121 provides that if alcoholism is material to a finding of disability, then benefits will be denied." A doctor's finding of alcoholism is not grounds to reject the doctor's other findings. It is grounds to find a claimaint is not entitled to benefits at step three, so long as the ALJ engages in the requisite analysis, which was not employed here. *E.g., Drapeau v. Massanari,* ___ F.3d ___, 2001 WL 694542 (10th Cir. 3/22/01) (requisite step three analysis for alcoholism finding).

omitted); *see also Evans v. Chater,* 55 F.3d 530, 532 (10th Cir. 1995) (noting "established rule that such inquiries must include all (and only) those impairments borne out by the evidentiary record").

Having rejected Dr. Hughson's findings, for his first hypothetical the ALJ requested the vocational expert to assume the three limitations Ms. Soisson noted in her report: (1) borderline intelligence; (2) a noisy environment affects Plaintiff's ability to hear; and (3) limited ability to handle high stress job. The vocational expert indicated a person with those limitations could not perform Plaintiff's past relevant work.

The ALJ's second hypothetical involved jobs in the national economy. The vocational expert testified that with those three limitations a person could perform the unskilled jobs of advertising material distributor, parking lot attendant, or surveillance system monitor.

The ALJ's final hypothetical asked the vocational expert to assume the same three limitations and also include the limitations noted by Dr. Hughson. The ALJ simply referred the vocational expert to Dr. Hughson's responses on the form, but did not articulate the limitations in the hypothetical. Dr. Hughson's form showed: (1) Plaintiff is "seriously limited" ability to "deal with stress" and, (2) depending on the severity of her tinnitus symptoms, Plaintiff ranges from "seriously limited" ability to "no useful ability" in "maintaining attention/concentration," "relating predictably in social situations" or "demonstrating reliability." *Record.* at 234-235.[8]

---

[8] Dr. Hughson completed the requested form, where "good" means ability to function is "limited but satisfactory;" "fair" means "ability to function is "seriously limited but not precluded;" and "poor or none" means "no useful ability to function in this area." *Record* at 233. Dr. Hughson assessed Plaintiff "fair" in her ability to "deal with stress." *Id.* at 234. She indicated Plaintiff would rate "fair" or "poor or none" in her ability to "maintain attention/concentration," "relate predictably in social situations" and "demonstrate reliability" depending on the "severity" of Plaintiff's symptoms. *Id.* at 234-35. She explained that "although Plaintiff enjoys people and

11

For the third hypothetical the vocational expert eliminated the surveillance system monitor position without explaining what limitations she took into account. Although both the ALJ and the vocational expert apparently found Dr. Hughson's assessment of "depending" upon severity imprecise, the doctor was not asked to clarify or testify. Moreover, on examination by Plaintiff's attorney the vocational expert essentially conceded that all of the jobs she identified would be eliminated if Dr. Hughson's limitations were present. *See id.* at 316-319.

Finally, even if Dr. Hughson's findings are ignored, the result is the same. In rejecting Dr. Hughson's findings, the ALJ made his own findings on his psychiatric review technique form "functional limitation" section. There, among other things, he was of the opinion Plaintiff "**often**" had "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)." *Id.* at 25. Although this level is not sufficient to result in step three finding of disability, it is relevant to the issue of availability of jobs in the national workplace. *See Cruse v. United States Dept. of Health & Human Servs.,* 49 F.3d 614, 619 (1995). In addition, Plaintiff testified to the need to distract herself from the ringing by lying down, an assertion not specifically discounted by the ALJ. Neither of these factors were submitted as limitations to the vocational expert by the ALJ.

Because there is no substantial evidence justifying the rejection of Dr. Hughson's report, because the vocational expert indicated that her conclusion at step five would be different based on Dr. Hughson's limitations, and because the vocational expert did not consider all impairments even absent Dr. Hughson's report, a remand is appropriate.

---

enjoys working, she is prone to becoming quite distracted and anxious when the tinnitus increases in severity and vice-versa, she tends to notice the tinnitus more whenever she is overstressed or anxious." *Id.* at 236, 231.

Wherefore,

**IT IS HEREBY RECOMMENDED THAT** Plaintiff's motion be granted and the matter remanded to the Commissioner for further proceedings, including additional consultations and evidence if warranted.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

                                                                         _____
                                                                         UNITED STATES MAGISTRATE JUDGE